**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4454-16T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JARRELL SWEET,

    Defendant-Appellant.

_____

> Submitted on September 16, 2019 – Decided October 17, 2019
>
> Before Judges Sabatino and Sumners.
>
> On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 16-01-0042.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Robert C. Pierce, Designated Counsel, on the brief).
>
> Esther Suarez, Hudson County Prosecutor, attorney for respondent (Erin M. Campbell, Assistant Prosecutor, on the brief).

PER CURIAM

A jury found defendant Jarrell Sweet guilty of second-degree aggravated assault of his ex-girlfriend, second-degree burglary, N.J.S.A. 2C:18-2(a)(1), second-degree endangering the welfare of children through abuse, N.J.S.A. 2C:24-4(a)(2), fourth-degree cruelty and neglect of children, N.J.S.A. 9:6-3, and third- and fourth-degree weapons charges, N.J.S.A. 2C:39-4(d) and N.J.S.A. 2C:39-5(d). He was sentenced to an aggregate fourteen-year prison term, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

Defendant, appeals contending:

> POINT I
>
> [DEFENDANT] WAS DEPRIVED OF A FAIR TRIAL BECAUSE DETECTIVE BOTELLO TESTIFIED THAT A STILL PHOTOGRAPH OF THE ALLEGED PERPETRATOR AT THE FERRY STATION WAS "ABSOLUTELY IN FACT [DEFENDANT]" WHEN THE IDENTITY OF THE PERSON WAS A QUESTION FOR THE JURY. (NOT RAISED BELOW).
>
> POINT II
>
> THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO INSTRUCT THE JURY WITH A SPECIFIC IDENTIFICATION CHARGE CONCERNING THE IDENTIFICATION TESTIMONY FROM G.J. AND DETECTIVE BOTELLO THAT CAME FROM THEIR OBSERVATIONS OF A STILL PHOTOGRAPH FROM THE FERRY STATION. (NOT RAISED BELOW).

POINT III

[DEFENDANT] WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL DUE TO COUNSEL'S FAILURE TO OBJECT TO DETECTIVE BOTELLO'S LAY OPINION IDENTIFICATION TESTIMONY, AND HIS FAILURE TO REQUEST A JURY INSTRUCTION ON IDENTIFICATION. (NOT RAISED BELOW).

POINT IV

THE TRIAL COURT ERRED BY ADMITTING INTO EVIDENCE THE SURVEILLANCE VIDEO FROM . . . 78TH STREET BECAUSE IT WAS NOT AUTHENTICATED, WHICH DEPRIVED [DEFENDANT] OF A FAIR TRIAL.

POINT V

THE PROSECUTOR COMMITTED MISCONDUCT DURING SUMMATION BY (1) STATING THAT THE PERSON IN THE FERRY STATION VIDEO WAS [DEFENDANT] WHO "STOPPED FOR A MINUTE TO DRINK WATER" BECAUSE HE WAS "TIRED AFTER BEATING THE CRAP OUT OF G.J[,]" (NOT RAISED BELOW)[,] AND (2) THE PROSECUTOR'S COMMENT THAT YOU HEARD THE TAXI DRIVER SAY "DUFFEL BAG," WHICH VIOLATED A PREVIOUS RULING BY THE TRIAL COURT[,] (PARTIALLY RAISED BELOW)[,] WHICH DEPRIVED [DEFENDANT] OF A FAIR TRIAL. (NOT RAISED BELOW).

POINT VI

THE TRIAL COURT COMMITTED PLAIN ERROR BY NOT STRIKING THE TESTIMONY AND

3

CHARGING THE JURY WITH A CURATIVE INSTRUCTION, SUA SPONTE, AFTER DETECTIVE DOWD STATED, "WHY DIDN'T YOUR CLIENT CONSENT TO A SEARCH OF HIS HOUSE TO AVOID THE POLICE HAVING TO GET A SEARCH WARRANT IF HE WAS SO WILLING TO COOPERATE?" (NOT RAISED BELOW).

POINT VII

THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO GIVE THE JURY A CURATIVE INSTRUCTION, SUA SPONTE, IMMEDIATELY AFTER DETECTIVE RECINOS STATED THAT G.J. OBTAINED A RESTRAINING ORDER AGAINST [DEFENDANT] AND THAT A JUDGE PROVIDED THE POLICE WITH PROBABLE CAUSE TO GENERATE ARREST WARRANTS. (NOT RAISED BELOW).

POINT VIII

THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE.

For the reasons that follow, we affirm in part, reverse in part, and remand for retrial.

I

Pertinent to the issues before us, the trial revealed the following.

A-4454-16T2

Defendant and G.J.'s Relationship

Defendant and G.J.[1] were co-workers for about six to eight months, who became friends.  On an evening in September 2013, defendant invited G.J. to his house. She accepted the invitation, which resulted in them having consensual sex.  Thinking she could not become pregnant because of a medical condition, their sex was unprotected.  Nonetheless, when they had sex again weeks later, defendant used protection.  At some point, G.J. realized she was pregnant from their first liaison, which upset defendant and he wanted her to have an abortion. G.J. refused.

After the child was born on May 4, 2014, defendant paid child support.[2] Beyond this, defendant minimally engaged in a fatherly role, having sporadic contact with his son.

On June 15, 2015, defendant visited G.J. and his son at her North Bergen apartment where the three had a pleasant evening.  Defendant traveled from his New York residence via ferry, supposedly, the only way he knew how to get to

---

[1]  We use initials to protect the identity of the victim.

[2]  Initially, defendant and G.J. reached a private child support agreement but when he failed to make timely payments, G.J. obtained a court-ordered support payment.

New Jersey to visit G.J.'s apartment. Defendant's entry and departure of the apartment was recorded on the building's surveillance camera system. During his visit, defendant told G.J. that he did not harbor any negative feelings toward her for not having an abortion and "was over it." Before defendant left, G.J. called a taxi service to take him to the Port Imperial Ferry Station (the Ferry Station) in Weehawken, so he could take the ferry back to New York. Defendant was never violent or abusive to her, or their son, that evening or any time prior, according to G.J.

The Attack

The evening after defendant's visit, June 16, G.J. was walking up the steps to her fourth floor apartment with her son and six-year-old niece when she noticed a black duffel bag and a pair of beige Timberland boots on the second landing fire escape. Undeterred, G.J. entered her apartment. When G.J.'s sister arrived to pick up G.J.'s niece, G.J. walked her niece to the second floor and watched as she continued down the stairs to meet her mother.

As G.J. was returning to her apartment, she heard her son crying and rushed up the stairs. Upon entering the apartment, she saw a black male, about five foot, eight inches tall, dressed in all black, emerge from her bedroom. He demanded, "where's the money?" then began attacking her by repeatedly

punching and shocking her with a Taser. G.J. fought back and screamed for help during the attack, which she recalled lasting approximately five or ten minutes.

At some point, G.J.'s neighbor, E.A., heard her screams from his apartment on the same floor. He ran to G.J.'s apartment and attempted to open the door, but someone inside promptly shut it. E.A. then forced the door open, stuck his head in, and was immediately punched in the face by the assailant. He testified the assailant was a dark skinned male, about five foot, ten inches tall, wearing a hooded sweatshirt, gloves, and dark clothing, with a bandana over his face. E.A. saw G.J. on the ground screaming, visibly in pain, and "very frantic." Once the assailant unveiled a Taser and E.A. heard a "crackling" sound, he retreated to his apartment to call the police.

After the attack was finished, G.J. made her way to the bedroom to check on her son. G.J. testified that she could not make out the assailant's features, but knew it was defendant based on her "intuition" and his "size and stature."

Police Investigation

North Bergen Police Officers Santiago Hernandez and Nelson Roman responded to E.A.'s domestic assault call around 9:30 p.m. After E.A. met them and explained what he witnessed, they went to G.J.'s apartment where they saw that she was severely injured. G.J.'s face was completely swollen, her eyes

partially forced shut, and "blood [was] everywhere." They also observed an apartment that was in disarray, a Taser on the ground, and an open kitchen window.

G.J and E.A. gave similar descriptions of the assailant. G.J was more definitive, stating that despite the assailant's covered face, she was one hundred percent sure he was defendant, and showed them a picture of him she had saved on her cell phone. She repeated her accusations on later dates and, under cross-examination, stated no relative or friend suggested she should identify the defendant as her assailant.

None of the numerous witnesses interviewed were able to identify defendant as the assailant, each giving varying accounts of his appearance. One witness stated the assailant wore a cap, light gray button down shirt, gray pants, and carried a duffel bag. Another witness said he saw a dark-skinned man in a hood, and a third witness said he was wearing a "light blue surgical mask." A taxi driver, who also testified at trial, stated the individual, who he drove to the Ferry Station the night of the incident, was a black male with a "little bag . . . Like a suitcase."

Surveillance video from various businesses, a residence near G.J.'s apartment building, and the Ferry Station, also aided the police in identifying a

suspect. They depicted an African-American male wearing a long sleeve red t-shirt, dark shorts, and boots, holding a duffel bag.

There was no forensic evidence from the crime scene that suggested defendant committed the assault. None of the various DNA samples taken from G.J.'s apartment matched defendant.[3] Smudged fingerprints found on the kitchen windows could not be used to identify anyone. Detectives also traced defendant's cell phone records, which only revealed two calls made from New York City: one at 6:33 p.m. and another at 10:33 p.m. There was no indication from cell phone records that defendant's cell phone was near G.J.'s apartment.

The Trial

During his testimony, North Bergen Police Detective Hector Botello stated that a still photograph of the Ferry Station surveillance footage the night of the assault, was "a still shot of the suspect." When asked what he learned from the video footage, the detective replied that "the person there entering was [defendant]." Later, when asked on cross-examination how he identified defendant as the man in the still photograph, he stated, "I know for a fact that's [defendant] . . . can I explain why I know? . . . You don't want me to." Defense

---

[3] When defendant was arrested, he consented to a buccal swap to collect his DNA.

counsel suggested the witness tell the prosecutor on re-direct, and neither objected nor requested that the statement be stricken from the record.

Several days later, the court sustained defendant's objection to Detective Robert Maldonado's identification of defendant in a surveillance video from the Ferry Station on June 15, the day he visited his son. At sidebar, the court instructed the State that Maldonado needed to use a description of the person and not identify him as defendant. The court rejected the State's contention that Maldonado could identify defendant in the video even though there was no dispute that defendant traveled by ferry to G.J.'s apartment. Maldonado subsequently identified the person as the same person matching the description of the man who was seen earlier in a video leaving G.J.'s apartment building.

Despite the court's directive, when Maldonado later discussed the June 16 Ferry Station video, he stated, "[t]he image we got . . . from the exit – entrance to [the Ferry Station] is the defendant sitting here." Defendant objected, which the court sustained. The court instructed the jury "whether or not the defendant is seen in the video is for you the jury to determine . . . please disregard the officer's last response."

During cross-examination, North Bergen Police Sergeant David Dowd was questioned regarding defendant's voluntary consent to various searches and

tests, including a DNA test, and the failure to obtain a search warrant for defendant's New York City residence. At one point, Sgt. Dowd remarked, "[i]f your client – why didn't your client consent to [a] search of his house to avoid [us] having to get a search warrant if he was so willing to cooperate?" The court stated, "[defense counsel] is not here to answer questions" before cross-examination continued.

Later, during direct examination of the taxi driver, the prosecutor asked whether he remembered if the man who took his cab on the night of the incident was carrying anything. Through an interpreter, the taxi driver responded, "[h]e had a little bag with him. . . . Like a briefcase." Immediately following this statement, the prosecutor stated, "I believe I heard the witness say duffel bag a couple times. I'm not sure[]"; to which defense counsel objected. Following a sidebar hearing, the judge gave a curative instruction that is detailed below.

Lastly, during summation, the prosecutor stated, "you'll have an opportunity if you want, if you choose, to hear the testimony again of [the taxi driver]. The State submits to you[,] if you listen to it again, you will hear him say duffel bag." Defense counsel did not object to this statement. Prior to this statement, the prosecutor also stated:

> Well, you saw the video from the night of June 16[,]
> 2015. You saw that video and you saw [Defendant] in

the video walking straight into the terminal.  He didn't stop to buy a ticket, he walked – actually he did stop. He stopped for about a minute to drink water.  He must have been tired.  He must have been tired after beating the crap out of [G.J.]

Again, defense counsel did not object.

Following deliberations, the jury was deadlocked on count three, the charge of assault against E.A., but returned a verdict of guilty as to all other counts of the indictment.  The court granted the State's motion to dismiss count three.

The court later denied defendant's motion for a new trial and sentenced him.  After merger, defendant was sentenced to an aggregate fourteen-year prison term subject to the NERA; based upon a seven-year NERA term for second-degree burglary, a ten-year NERA term for second-degree aggravated assault, a four-year term for third-degree aggravated assault, and an eighteen-month term for fourth-degree unlawful possession of a weapon, all to be served concurrent to each other followed by a consecutive four-year term for third-degree aggravated assault.

## II

With the exception of defendant's contentions in Points III, IV, and VIII, defendant's remaining merit brief points were not raised before the trial court,

thus our plain error standard of review applies. R. 2:10-2.  "Any error or omission shall be disregarded by [this court] unless it is of such a nature as to have been clearly capable of producing an unjust result . . . ."  Ibid.  In a jury trial, the possibility of such an unjust result must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached."  State v. Macon, 57 N.J. 325, 336 (1971).  Defendant carries the burden of showing plain error.  State v. Morton, 155 N.J. 383, 421 (1998).

We conclude plain error applies to defendant's identification arguments in Point I, Det. Botello's lay opinion testimony identifying defendant in the still photo outside the Ferry Station, and in Point II, the court's failure to give a specific identification jury charge, which together warrant a reversal of defendant's convictions and a new trial.  This, in turn, negates any need to address defendant's contention in Point III that counsel was ineffective due to his failure to: (1) object to Det. Botello's lay opinion identification testimony; and (2) request a jury instruction on identification.  In addition, because of our reversal, we need not address the excessive sentence claim made in Point VIII.

Before discussing our reasons for reversal, we first address defendant's arguments that we reject: (1) the trial court erred in its admission of a surveillance video (Point IV); (2) there was plain error regarding prosecutorial

misconduct (Point V); (3) there was plain error regarding the State's witness's remark about defendant's failure to consent to a search warrant (Point VI); and (4) there was plain error regarding the State's witness's remark on the issuance of a restraining order against defendant (Point VII).

A.

In Point IV, defendant contends the court committed reversible error because it permitted the State to introduce video footage from a surveillance system located at a residence near G.J.'s apartment building that was not authenticated by the owner and operator of the surveillance system. The video displayed a black male wearing a light gray shirt and carrying a duffel bag, who according to the State was G.J.'s assailant. Defendant stresses the video was in contrast to the surveillance video footage recovered from other nearby businesses that depicted a black male wearing shorts and a red shirt. A still picture of the suspect was taken from the video.

Defendant argues five conditions that apply to audio-recordings, State v. Driver, 38 N.J. 255, 287 (1962), also apply to video recordings, and were not satisfied by the State to support admission of the surveillance video footage in question. These conditions are:

> The speakers should be identified and it should be
> shown that[:] (1) the device was capable of taking the

> conversation or statement[;] (2) its operator was competent[;] (3) the recording is authentic and correct[;] (4) no changes, additions or deletions have been made[;] and (5) in instances of alleged confessions, that the statements were elicited voluntarily and without any inducement.
>
> [Driver, 38 N.J. at 287 (1962).]

Defendant contends these conditions were not fulfilled by the testimony of North Bergen Police Det. Jason Apello because he failed to testify that before placing the video onto a flash drive, he personally reviewed the video "in real time," and that the time and date were accurate.

It is well-settled that a videotape "qualifies as a writing[ ]" under N.J.R.E. 801(e) and must be "properly authenticated" before being admitted. See State v. Wilson, 135 N.J. 4, 17 (1994). Under N.J.R.E. 901, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter is what its proponent claims." The authentication rule "does not require absolute certainty or conclusive proof." State v. Mays, 321 N.J. Super. 619, 628 (App. Div. 1999). "The proponent of the evidence is only required to make a prima facie showing of authenticity." Ibid. (citations omitted). "Once a prima facie showing is made, the [item] is admissible, and the ultimate question of authenticity of the evidence is left to the jury." Ibid. (citations omitted).

15

Authentication of a videotape is similar to the authentication of a photograph. State v. Loftin, 287 N.J. Super. 76, 98 (App. Div. 1996). "[T]estimony must establish that the videotape is an accurate reproduction of that which it purports to represent and the reproduction is of the scene at the time the incident took place." Ibid. (citing Wilson, 135 N.J. at 15). The photographer or videographer need not testify "because the ultimate object of an authentication is to establish its accuracy or correctness." Wilson, 135 N.J. at 14. Thus, "any person with the requisite knowledge of the facts represented in the photograph or videotape may authenticate it." Ibid.

After reviewing the record, we conclude the court's decision to admit the video was not an abuse of discretion. See State v. Brown, 170 N.J. 138, 147 (2001). Det. Apello provided the authenticity of the surveillance video footage without the necessity of the testimony of the camera system's owner. He testified that a week after G.J was attacked, he observed a surveillance camera on the outside of a home near G.J.'s apartment building. He further explained that he and other officers watched the video, which covered the date around the time of G.J.'s attack, and saw a male with a duffel bag walking east. He determined the video footage's date and time was accurate by checking the video's time stamp against the time on his watch or cellphone, because

16

"occasionally, [the surveillance equipment is] not linked up with the internet so the times may be off, the dates could be off." He further verified the video depicted the area near G.J.'s residence. Accordingly, there was no unjust result by the court's admission into evidence of the video and the still photograph captured therefrom.

B.

In Point V, defendant contends the prosecutor committed misconduct in making two remarks during summation. Before specifying the remarks, we first mention the principles that govern our review.

To warrant a new trial for prosecutorial misconduct, the conduct must have been "'clearly and unmistakably improper,' and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." State v. Smith, 167 N.J. 158, 181-82 (2001) (quoting State v. Timmendequas, 161 N.J. 515, 575 (1999)). While a prosecutor "in its summation may suggest legitimate inferences to be drawn from the record," a prosecutor "commits misconduct when [the summation] goes beyond the facts before the jury." State v. Harris, 156 N.J. 122, 194 (1998). In determining whether a prosecutor's actions were sufficiently egregious, we consider: (1) whether defense counsel made a timely and proper objection; (2) whether the

remarks were promptly withdrawn; and (3) whether the judge struck the remarks from the record and issued a curative instruction. State v. Frost, 158 N.J. 76, 83 (1999). In our review, "we consider the tenor of the trial and the responsiveness of counsel and the court to the improprieties when they occurred." Timmendequas, 161 N.J. at 575. If no objection was made, the prosecutor's conduct generally will not be deemed prejudicial, as the failure to object indicates counsel did not consider the conduct improper and deprives the trial judge of the opportunity to take curative action. State v. Echols, 199 N.J. 344, 360 (2009).

    1. The First Remark

    The prosecutor urged the jury that defendant was the individual in the Ferry Station surveillance video and "stopped for about a minute to drink water . . . . he must have been tired after beating the crap out of [G.J.]" Defendant stresses the sole question for the jury was the identification of the man in the Ferry Station surveillance video, and any comments made inferring defendant was the individual – other than those by G.J. – constitute reversible plain error. Defendant points out that Det. Botello impermissibly identified defendant as the man in the video, which was repeated by Detective Maldonado, and the court attempted to remedy the issue with a curative instruction. He argues that despite

18

this curative instruction, the prosecutor made an unsupported comment implicating defendant as the man in the video, and therefore, reversal is necessary.

We conclude the prosecutor's comment that it was defendant in the video does not constitute prosecutorial misconduct. Even though identification was the sole question for the jury, the prosecutor's argument during summation was essentially attempting to persuade the jury that defendant was the man in the video. The comment that it was defendant in the video does not constitute prosecutorial misconduct because it was supported in the record by G.J.'s admitted testimony. As for Det. Botello's identification testimony, it is discussed below as impermissible lay opinion testimony in Section III. With respect to the "drinking water/beating G.J." comment, the prosecutor drew an inference, albeit a stretch, based upon the evidence. And, given the lack of an objection, no unjust result occurred.

The record reveals this trial was fought zealously by both parties, and our courts "have recognized that criminal trials provoke strong feelings and that 'rhetorical excesses . . . invariably attend litigation.'" State v. Smith, 212 N.J. 365, 409 (2012) (quoting State v. Williams, 113 N.J. 393, 456 (1988)). And it is well-settled that "such excesses . . . do not always justify reversing a jury's

verdict." Ibid. (citing Frost, 158 N.J. at 88). The prosecutor's remarks did not compromise the jury's ability as fact-finders. Moreover, the court instructed the jury that they are the sole judges of the evidence, summations are not evidence, and we presume the jurors followed the court's instructions. State v. Montgomery, 427 N.J. Super. 403, 410 (App. Div. 2012).

2. The Second Remark

The prosecutor's alleged second inappropriate comment pertained to the bag carried by the male who was taken by taxi to the Ferry Station the night of the incident. The taxi driver, through an interpreter, stated the man had a "briefcase," not a duffel bag. The prosecutor declared, "I believe I heard [the taxi driver] say duffel bag a couple times, I'm not sure[,]" defense counsel objected and moved for a mistrial claiming there was a material misrepresentation of the taxi driver's testimony. The court denied the request, but agreed with defense counsel to give a curative instruction.

The jury was told the statement was stricken from the record and cautioned them:

> Since we are using an interpreter, you are bound by
> what the interpreter says the witness sa[id], [alright]?
>
> . . . .

So, let's say somebody in the jury does understand the Arabic language and you think the witness said something because you understand it . . . you have to disregard it because the record and what you can consider is only as interpreted by the interpreter.

Now, we had an added issue here, where . . . the [prosecutor] said that [the taxi driver] said duffel bag. She is not a witness in this case. You are to completely disregard that comment. It is not proper for an attorney to tell you what the evidence is. The only thing an attorney can do is present the evidence to you by way of witnesses.

So, with respect to this witness, whatever your recollection was as to the answers to what he was carrying, as stated by the interpreter, is the only thing you may consider as evidence in this case.

During summation, this issue was raised again when the prosecutor remarked, "[t]he State submits to you if you listen to it again, you will hear him say duffel bag." There was no objection by defense counsel. Although the prosecutor essentially suggested to the jury that the interpreter was wrong, defendant now argues that the State misrepresented the taxi driver's testimony about the type of bag the man carried.

In support of reversal, defendant cites State v. Ross, 249 N.J. Super. 246 (App. Div. 1991), where we reversed a defendant's conviction because a prosecutor argued during summation that a ten-year-old sex abuse victim could not fabricate the details of her account of the incident, despite the prosecutor

21

being aware of the victim's prior history of abuse.  249 N.J. Super. at 250-52. We held that "[f]or the prosecutor to have made that argument knowing it to be at least arguably contrary to the facts which defendant was precluded from adducing was improper, unfair, and, in view of the paramountcy of credibility issue, irremediably prejudicial."  Id. at 250.

Although the prosecutor's summation remark was improper because it was a misstatement of the taxi driver's testimony as translated by the interpreter, we cannot conclude that it was capable of causing an unjust result.  We are unpersuaded that Ross demands a reversal of defendant's conviction.  There was a basis for the prosecutor's assertion that the suspect was carrying a duffel bag because of the testimony by other witnesses and the surveillance videos that depicted what the suspect carried.  Moreover, since the court gave a curative instruction to the jury, and also instructed them that summations are not evidence and they are the sole finders-of-fact, the comment was not "so egregious that it deprived the defendant of a fair trial," and thus, reversal is not warranted.  Frost, 158 N.J. at 83; see State v. Ramseur, 106 N.J. 123, 322 (1987). There is no indication that the jury did not follow the court's instructions.  See Montgomery, 427 N.J. Super. at 410.

C.

In Point VI, defendant argues Sgt. Dowd's comment during cross-examination, "[w]hy didn't your client consent to a search of his house to avoid the police having to get a search warrant if he was so willing to cooperate[,]" deprived him of a fair trial because it shifted the burden of proof onto him. In particular, he asserts the statement compromised his presumption of innocence, effectively requiring him to present evidence tending to rebut Sgt. Dowd's assertions. Had his counsel objected to the statement, the court would have given a curative instruction to the jury to remedy such an egregious error. We are unpersuaded.

The comment by Sgt. Dowd was inappropriate because it suggested that, had defendant consented to a search of his residence, the police would not have had to obtain a search warrant. Defendant had no obligation to consent to a search of his residence. Yet, the comment, which was not objected to, did not shift the burden to defendant to prove his innocence. The prosecutor did not make the comment, which would imply the State's trial strategy. The comment was made by a witness in response to defense counsel's cross-examination that informed the jury that defendant voluntarily consented to: (1) being interviewed

A-4454-16T2

by police; (2) providing a DNA and fingerprint sample; (3) turning over his cellphone; and (4) cooperating with DYFS workers.

This is not like State v. Jones, 364 N.J. Super. 376 (App. Div. 2003), which is cited by defendant to support reversal of his conviction. There, we reversed the defendant's conviction because the prosecutor, in response to the defendant's argument that a fingerprint analysis was never completed on the firearm allegedly used to commit the crime, summed-up stating, "[a]nd while the defense never has a burden of proof, when they put on a case[,] stop and ask yourself why isn't it they dusted the gun for prints to disprove that his fingerprints were on there?  Maybe the defendant knows something we don't, that it is his gun." Jones, 364 N.J. Super. at 382.  Defendant did not object to the comments, but we determined they were "so clearly erroneous and so capable of affecting the jury's deliberations that we are constrained to reverse [the] defendant's conviction." Ibid.

We cannot agree with defendant that this fleeting comment made by a witness during a heated cross-examination was reversible error and created an unjust result that denied defendant a fair trial.

D.

In Point VII, defendant contends plain error occurred when New Bergen Police Officer Carmen Recinos "testified that, based upon G.J.'s statement, she obtained a restraining order, coupled with her remark that a judge provided the police with probable cause to arrest [defendant] . . . ." Defendant further maintains the court failed to issue a curative instruction considering "the testimony is much more egregious because Officer Recinos stated that a family court judge found G.J.'s testimony credible and granted her a restraining order." Defendant reasons that plain error occurred because with Officer Recinos's "restraining order and arrest warrant testimony, the jury could infer that [defendant] committed the offenses and was a present danger to hurt or even kill G.J. and her young son."

While on direct examination, Officer Recinos was discussing a statement he obtained from G.J. during an interview after defendant had given a statement at the police station, when the following colloquy ensued:

> Q: Based on the statement that you got from [G.J.], what did you do?
>
> A [(Recinos)]: She had requested a restraining order. So we called one of our judges on the scene being that she couldn't walk that much still. He granted her the restraining order.

Q: And what did you do after that?

A [(Recinos)]: After that we headed back to headquarters and we advised the [j]udge . . . of her statement and what she said, and he provided us with probable cause to generate warrants to arrest [defendant].

We find no merit to defendant's contention that Officer Recinos's testimony had the ability to influence the jury to find defendant guilty of attacking G.J. and the related offenses because a restraining order and arrest warrant were issued. Officer Recinos's brief testimony was merely an outline of the process that led to defendant's arrest. See State v. Marshall, 148 N.J. 89, 240 (1997), (holding there was no authority in support of a rule that "the jury should be shielded from knowledge that search warrants have been issued in a criminal matter because the prior judicial determination of probable cause may influence the jury to assume guilt."). The prosecutor did not harp on this process in her summation or, for that matter, have any other witness echo this testimony. No unjust result occurred in defendant's trial due to Officer Recinos's comments.

III.

Because defendant's respective arguments in Points I and II, concerning Det. Botello's lay opinion testimony identifying defendant in a still photo, and

the trial court's failure to give a specific identification jury charge, are interrelated, we address them together.

A.

Stressing that Det. Botello never actually met defendant and was only familiar with him in connection with the investigation and reviewing surveillance video footage, defendant argues the State improperly bolstered G.J.'s testimony that defendant was her masked assailant based upon her "intuition", by introducing the inadmissible lay opinion of Det. Botello that defendant was the individual in the still photograph from the Ferry Station surveillance video footage. G.J. testified that the man in the photograph, which she had never seen before, was defendant.[4] Defendant maintains that because Det. Botello was not sufficiently familiar with him, he impermissibly encroached on the jury's responsibility of identifying defendant in the photograph.

Defendant further argues the court committed reversible error because it failed to instruct the jury on identification, which was pertinent to the identifications made by G.J. and Det. Botello, thereby, denying defendant of his

---

[4] According to G.J.'s grand jury testimony, the photograph was shown to her at her sister's house four days after the assault, and she identified the man as defendant. The jury was not made aware of this identification.

A-4454-16T2

right to a fair trial. He submits the court had the duty "to instruct the jury as to fundamental principles of law which control the case," and that duty was not extinguished by the failure to request a specific identification charge.

We are guided by the following principles. Lay opinion testimony is permitted when it is "rationally based on the perception of the witness" and "will assist in understanding the witness' testimony or in determining a fact in issue." N.J.R.E. 701. Lay opinion testimony "is not a vehicle for offering the view of the witness about a series of facts that the jury can evaluate for itself or an opportunity to express a view on guilt or innocence." State v. McLean, 205 N.J. 438, 462 (2011). "[T]estimony in the form of an opinion, whether offered by a lay or an expert witness, is only permitted if it will assist the jury in performing its function." McLean, 205 N.J. at 462. "The [r]ule does not permit a witness to offer a lay opinion on a matter . . . as to which the jury is as competent as he to form a conclusion[.]" Id. at 459 (internal quotation marks and citation omitted). Furthermore, a police witness is not permitted to offer an opinion regarding a defendant's guilt. State v. Frisby, 174 N.J. 583, 593-94 (2002) (disapproving police testimony that opined regarding innocence of one person and inferentially the guilt of the defendant); State v. Landeros, 20 N.J. 69, 74-

75 (1955) (holding that a police captain's testimony that defendant was "as guilty as Mrs. Murphy's pet pig" caused "enormous" prejudice warranting reversal).

These principles apply to opinions regarding an offender's identity. "In an identification case, it is for the jury to decide whether an eyewitness credibly identified the defendant." State v. Lazo, 209 N.J. 9, 24 (2012).

In Lazo, the issue was whether it was proper for a detective with no personal knowledge of the crime to testify at trial that he included the defendant's photo in a photo array because the defendant's photo resembled the composite sketch of the assailant. Id. at 12. The issue in Lazo had been fully raised and argued at trial and, thus, was not raised as plain error as it is here. Our Supreme Court noted that "[t]he victim's identification was the only evidence linking defendant to the crime. No physical evidence or other corroboration of the identification was presented." Id. at 15. The jury in Lazo convicted the defendant of second-degree robbery and second-degree conspiracy to commit robbery. Id. at 16.

The Court held that the detective's testimony violated N.J.R.E. 701 because his opinion was not based on personal knowledge, and the testimony only served to bolster the victim's identification, which was the sole basis of the defendant's conviction. Id. at 24. The detective did not witness the crime, did

not know the defendant, and relied solely on the victim's description.  Ibid.  "Nor was there a change in appearance that the officer could help clarify for the jurors; they could have compared the photo and the sketch on their own.  Finally, the sole eyewitness told the jury what he observed firsthand."  Ibid.

The Court reversed, holding that a police officer may not "improperly bolster or vouch for an eyewitness' credibility and thus invade the jury's province."  Ibid.  Because the identification was the only evidence against the defendant, the Court could not "conclude that the error was harmless."  Id. at 27.

The Lazo Court reviewed federal authority on whether a lay police witness may opine that a defendant is depicted in a crime scene photograph.  The Court noted that one federal court held lay opinion "permissible where the witness has had sufficient contact with the defendant to achieve a level of familiarity that renders the lay opinion helpful."  Id. at 22 (internal quotation marks and citation omitted).  Whether the opinion is helpful in turn depends on the witness's knowledge of the defendant's appearance at the time of the crime, the defendant's dress, and "whether the defendant disguised his appearance during the offense or altered her looks before trial, and whether the witness knew the defendant over time and in a variety of circumstances."  Ibid. (internal quotation marks and citation omitted).  "[C]ourts recognize that when there is no change in

30

defendant's appearance, juries can decide for themselves—without identification testimony from law enforcement—whether the person in a photograph is the defendant sitting before them." Id. at 23.

The Court cited a decision finding it error to admit an officer's opinion that a defendant was depicted in a bank surveillance photo where the officer's opinion "was based entirely on his review of photographs . . . and witnesses' descriptions . . . ." Ibid. (internal quotation marks and citation omitted). Another factor in determining whether to permit a lay opinion on identification is "whether there are additional witnesses available to identify the defendant at trial." Ibid.

The Court cited favorably to the Law Division's 1981 decision in Carbone. In Carbone, the defendant was charged with five armed bank robberies, and the State secured statements from individuals who knew the defendant and who identified him from photographs taken by the banks' surveillance cameras. 180 N.J. Super. at 96-97. Citing cases from other jurisdictions, the Law Division, considered a number of factors in reaching its determination that the proposed identifications were admissible, including: (1) the fact that the defendant's appearance had changed since the time of the offense charged; (2) the lack of eyewitnesses to the offenses charged; (3) the extent of the potential witnesses'

familiarity with the defendant, particularly at the time of the offenses charged; and (4) the basis of the witnesses' knowledge of the defendant. Id. at 97-100.

Although New Jersey law is sparse on the subject of the admissibility of lay opinion testimony identifying a defendant from surveillance video or surveillance photographs, there is abundant case law from other jurisdictions on the subject. Those cases generally hold that such testimony may be admissible after considering a variety of factors, including a number of the factors set forth under New Jersey case law in Lazo and Carbone.[5]

---

[5] See, e.g., United States v. White, 639 F.3d 331, 335-36 (7th Cir. 2011); United States v. Contreras, 536 F.3d 1167, 1170-73 (10th Cir. 2008); United States v. Beck, 418 F.3d 1008, 1013-15 (9th Cir. 2005); Nooner v. State, 907 S.W.2d 677, 684-86 (Ark. 1995); People v. Leon, 352 P.3d 289, 312-13 (Cal. 2015); Robinson v. People, 927 P.2d 381, 382-85 (Colo. 1996) (en banc); Young v. United States, 111 A.3d 13, 15-16 (D.C. 2015); Glenn v. State, 806 S.E.2d 564, 568-69 (Ga. 2017); State v. Barnes, 212 P.3d 1017, 1020-26 (Idaho Ct. App. 2009); People v. Thompson, 49 N.E.3d 393, 402-09 (Ill. 2016); Gibson v. State, 709 N.E.2d 11, 15-16 (Ind. Ct. App. 1999); Morgan v. Commonwealth, 421 S.W.3d 388, 391-92 (Ky. 2014); State v. Berniard, 163 So.3d 71, 89-91 (La. Ct. App. 2015); State v. Robinson, 118 A.3d 242, 247-52 (Me. 2015); Moreland v. State, 53 A.3d 449, 453-56 (Md. Ct. Spec. App. 2012); Commonwealth v. Vacher, 14 N.E.3d 264, 278-79 (Mass. 2014); Lenoir v. State, 222 So.3d 273, 276-78 (Miss. 2017) (en banc); State v. Gardner, 955 S.W.2d 819, 823-25 (Mo. Ct. App. 1997); Rossana v. State, 934 P.2d 1045, 1048-49 (Nev. 1997); State v. Sweat, 404 P.3d 20, 22, 24-27 (N.M. Ct. App. 2017); People v. Sanchez, 941 N.Y.S.2d 599, 606 (App. Div. 2012), aff'd, 991 N.E.2d 698 (N.Y. 2013); State v. Patterson, 791 S.E.2d 517, 520-23 (N.C. Ct. App. 2016), review denied, 794 S.E.2d 328 (N.C. 2016); State v. Fripp, 721 S.E.2d 465, 467-69 (S.C. Ct. App. 2012); Woods v. State, 13 S.W.3d 100, 101-05 (Tex. Crim. App. 2000); State v.

A few courts from other states have concluded that lay opinion testimony is more likely to be admissible when the surveillance video is of passable quality, but is grainy or shows only a partial view of the person of interest. See, e.g., Nooner, 907 S.W.2d at 685; Glenn, 806 S.E.2d at 569; Barnes, 212 P.3d at 1025; Thompson, 49 N.E.3d at 404. In such cases, the lay witnesses' opinions become more valuable to the jury, based upon their superior knowledge of the defendant's appearance, particularly around the time of the crime.

B.

Defendant also argues as plain error that reversal should be granted because the trial court failed to give any instruction on identification. In particular, he cites Model Jury Charge (Criminal), "Identification: In-Court and Out-of-Court Identifications" (Revised June 5, 2006), or Model Jury Charge (Criminal), "Identification: No In-Court and Out-of-Court Identifications Out-of-Court Identification Only" (Approved October 26, 2015).

It is undisputed that "[a]ppropriate and proper charges to a jury are essential for a fair trial." State v. Green, 86 N.J. 281, 287 (1981). The trial court must guarantee that jurors receive accurate instructions on the law as it pertains

---

George, 206 P.3d 697, 700-02 (Wash. Ct. App. 2009), review denied, 217 P.3d 783 (Wash. 2009). But see State v. Finan, 881 A.2d 187, 191-94 (Conn. 2005); Ibar v. State, 938 So.2d 451, 462 (Fla. 2006).

to the facts and issues of each case. State v. Smith, 210 N.J. Super. 43, 54 (App. Div. 1986). A trial court is vested with discretion in delivering the jury instructions that are most applicable to the criminal matter before it." State v. Funderburg, 225 N.J. 66, 80 (2016) (citing State v. Ernst, 32 N.J. 567, 583-84 (1960)). "An erroneous jury charge when the subject matter is fundamental and essential or is substantially material is almost always considered prejudicial." State v. Maloney, 216 N.J. 91, 104-05 (2013) (internal quotation marks and citation omitted). We apply a presumption that improper instructions are reversible error in criminal cases. Id. at 105. However, that presumption is overcome if the error is "'harmless beyond a reasonable doubt.'" Ibid. (quoting State v. Collier, 90 N.J. 117, 123 (1982)).

"Plain error in the context of a jury charge . . . [must be] sufficiently grievous . . . to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Hyman, 451 N.J. Super. 429, 455 (App. Div. 2017) (alterations in original) (quoting State v. Torres, 183 N.J. 554, 564 (2005)). "Under the plain error standard, [the] 'defendant has the burden of proving that the error was clear and obvious and that it affected his [or her] substantial rights.'" State v. Koskovich, 168 N.J. 448, 529 (2001) (quoting State v. Morton, 155 N.J. 383, 421 (1998)). The plain error analysis of

34

an erroneous jury charge mandates that the reviewing court examine the charge as a whole to determine its overall effect.  State v. McKinney, 223 N.J. 475, 494 (2015).

There is presently no New Jersey model jury charge on evaluating lay witness opinion testimony in this particular context.  The model charges on identification evidence specifically address only identifications made by eyewitnesses to the crime; they do not address identifications made based upon surveillance video of a crime.  Model Jury Charge (Criminal), "Identification: In-Court Identification Only" (rev. July 19, 2012, eff. Sept. 4, 2012); Model Jury Charge (Criminal), "Identification:  Out-of-Court Identification Only" (rev. July 19, 2012, eff. Sept. 4, 2012); Model Jury Charge (Criminal), "Identification:  In-Court and Out-of-Court Identifications" (rev. July 19 2012, eff. Sept. 4, 2012). There is, however, a federal jury charge on lay witness opinion.  See Modern Federal Jury Instructions – Criminal, 2.10, "Opinion Evidence (Lay Witnesses) (F.R.E. 701)" (2018).[6]

---

[6] Witnesses are not generally permitted to state their personal opinions about important questions in a trial.  However, a witness may be allowed to testify to his or her opinion if it is rationally based on the witness's perception and is helpful to a clear understanding of the witness's testimony or to the determination of a fact in issue.

A-4454-16T2

C.

Applying these principles leads us to conclude that the combination of Det. Botello's testimony identifying defendant as the man in the still photograph at the Ferry Station on the night of the assault, and the absence of any identification jury instructions, were clearly capable of creating an unjust result requiring a new trial.

In this case, defendant's guilt turned on identification. There was no physical evidence linking defendant to G.J.'s attack, such as DNA or fingerprints. Defendant's cell phone records did not indicate he was near the vicinity of G.J.'s apartment the night of the attack. Although witnesses gave physical descriptions of the assailant, only G.J testified that defendant was her assailant. Despite the fact that his face was covered, it was her "intuition," based upon knowing him from their work and personal relationship, which led her to conclude he was her attacker.

---

In this case, I am permitting (name) to offer (his)(her) opinion based on (his)(her) perceptions. The opinion of this witness should receive whatever weight you think appropriate, given all the other evidence in the case and the other factors I will discuss in my final instructions for weighing and considering whether to believe the testimony of witnesses.

Modern Federal Jury Instructions-Criminal 2.10 (2019)

A-4454-16T2

There are no facts in the record to indicate that Det. Botello had any familiarity with defendant prior to or during his investigation into G.J.'s attack enabling him to identify defendant from a still photograph of the video.[7]  The detective neither witnessed the crime nor knew defendant prior to the incident; apparently relying solely on the descriptions provided by G.J. and other witnesses regarding defendant's clothing and physical build.  He seemingly had no more insight into the suspect's identity then members of the jury.

Our concern regarding Det. Botello's testimony is highlighted by the fact that when Det. Maldonado subsequently identified defendant in the same Ferry Station video, the court struck it from the record based on defendant's timely objection.  The court's instruction that it is the jury's role to decide whether the defendant is in the video (as well the still photograph taken therefrom) equally applies to Det. Botello's testimony.  Clearly, the court was troubled about the impact of this lay opinion testimony.

Consequently, it appears that Det. Botello's identification testimony served only to bolster G.J.'s testimony and was, therefore, inadmissible.  This, however, is not the end of our analysis of his testimony's impact.

---

[7]  Since neither provided a dvd of the surveillance video nor a copy – not a photocopy – of the still photograph, we have no way of evaluating defendant's claim that it was a grainy and unclear image of the suspect.

The inadmissibility of Det. Botello's testimony is compounded by the jury not receiving any instructions on how it should evaluate identification testimony. Despite our state's absence of any model jury charge on evaluating lay witness opinion testimony, it is incumbent upon the trial court to fashion charges that address the law and facts of a particular case. The court should have developed charges by examining our model jury charges, and possibly considered adapting related jury charges from other jurisdictions that were in place at time of trial. In doing so, the jury would have been given guidance on how to evaluate Det. Botello's identification testimony of defendant in the still photograph.

Considering both the allowance of Det. Botello's identification testimony and the lack of jury instructions on how to assess his testimony, we do not find these errors harmless. Identification of G.J's assailant was the only trial issue and given the limited evidence against defendant, the combination of these two errors were capable of producing an unjust result. Accordingly, we reverse his convictions and remand for retrial.

Affirmed in part, reversed in part and remanded for retrial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION