302 Ga. 276
FINAL COPY

S17A0858. GLENN v. THE STATE.

GRANT, Justice.

A DeKalb County jury found appellant Delron Glenn guilty of malice murder in connection with the shooting death of John Tanner.[1] Glenn raises four enumerations of error pertaining to his trial: (1) the trial court erred in denying his motion in limine to prevent lay witness identification testimony;

---

[1] The crimes occurred on February 3, 2015. On April 28, 2015, a DeKalb County grand jury indicted Glenn for malice murder, among other crimes. After a trial held August 17-21, 2015, the jury found Glenn guilty of malice murder, two counts of felony murder, one count of armed robbery, one count of aggravated assault with a deadly weapon, and one count of possession of a firearm during the commission of a felony. The trial court sentenced Glenn to life in prison for the malice murder conviction and five years to be served consecutively for possession of a firearm during the commission of a felony. The trial court vacated the remaining counts. Though the trial court's nomenclature was incorrect, the result was proper. See *Malcolm v. State*, 263 Ga. 369, 371-372 (4)-(5) (434 SE2d 479) (1993). On August 28, 2015, Glenn filed a motion for new trial, which was amended with new counsel on March 16, 2016. Following a hearing on July 26, 2016, the trial court denied his motion on September 26, 2016. Glenn filed a timely notice of appeal, and the case was docketed in this Court to the April 2017 term and was orally argued on April 18, 2017.

(2) the trial court erred in denying his motion to suppress the search of his sister's apartment because the magistrate judge lacked probable cause to issue the search warrant; (3) the trial court erred in denying his motion to suppress a cell phone seized during that search, and; (4) his trial counsel was ineffective for failing to identify and redact references to Glenn's gang affiliation that were contained in a co-defendant's videotaped statement which was played for the jury. Finding no error, we affirm.

## I.

The facts, in the light most favorable to the verdicts, show the following. On February 3, 2015, John Tanner, accompanied by an unknown female, went to an Affordable Inn motel. When he arrived at his room, he encountered Denard Pryor, who was there with another man nicknamed "Black." Tanner left with Pryor to get a laptop out of Tanner's car, which was parked in the motel parking lot. Tanner then moved his car around the corner of the building.

Meanwhile, Glenn's ex-girlfriend, Teneshia Johnson, drove Glenn to the same Affordable Inn motel. She dropped Glenn off at the back of the motel, where he met his brother and eventual co-defendant, Calvin Glenn,

2

co-indictee Stanley Kitchens,[2] and another man. When Tanner and Pryor came around the corner in Tanner's car, Pryor recognized the four men standing in the parking lot. Calvin and his entourage, including Glenn, had come to the motel to confront Tanner because Tanner allegedly owed Calvin some money. When Calvin saw Tanner, Calvin became angry and said he was going to "go handle this." Glenn then asked Calvin to give him a gun.

Tanner was out of his car, with Calvin and Glenn following him, when the two men began "roughing up" Tanner. Tanner then managed to get back inside his car, but Calvin and Glenn followed Tanner to his car and proceeded to steal Tanner's briefcase, keys to his home, and an LG MS395 cell phone. During the "roughing up" and the robbery, witnesses heard a gunshot. Calvin and Glenn then got out of Tanner's car and ran away. Glenn was spotted with a small silver gun in his hand as he ran. The men dropped a red cell phone and a key ring during their flight.

In response to a 911 call, police arrived at the Affordable Inn shortly after the shot was fired. They found a car that was still running with the door open. Tanner was found unresponsive in the driver's seat. Officers collected a .25 caliber cartridge casing, a number of business cards, a video

---

[2] Kitchens was indicted with the Glenn brothers but entered a guilty plea and testified at their trial.

surveillance recording, and several fingerprints from the crime scene. Officers also noticed that Tanner's cell phone holder was empty and that there was an empty box for an LG MS395 phone in the car's back seat. Tanner died from a single .25 caliber gunshot wound to his abdomen; no firearm connected to that casing or bullet was ever recovered.

The motel manager gave police the video surveillance recording that captured Tanner's last moments. The recording showed Tanner being taken to the ground by two men on the car's left side while two other men ransacked the car from the right side. The manager thought she recognized two of the people in the video, whom she knew by their nicknames "Fat" and "Man." "Fat" was later determined to be Pryor, and "Man" was later determined to be Kitchens. The manager identified Kitchens because he stuck his face into the camera and because he was known to her since he had been banned from motel property. The video also showed Kitchens and three other men fleeing the parking lot via a "cut path" that led to the Hidden Woods apartments on the other side of the motel. A search of the path turned up the key ring and red cell phone. Police issued a BOLO (be on the lookout) notice describing the suspects; minutes later, Calvin was arrested

4

near the Hidden Woods apartments. The red phone turned out to belong to Calvin.

Six days after the crime, Kitchens was arrested. He admitted to serving as a lookout at the corner of the motel building, but pinned the murder on Calvin and Glenn despite denying that he ever saw the actual shooting. Kitchens identified the fourth male by the nickname "Red." He told police that Calvin went by the street name "Kirkwood," while Glenn went by the name "Uzi." Kitchens illuminated a motive: money. Calvin had seen Tanner at a nearby gas station earlier that day and became upset because Tanner owed him money for drugs. Calvin called his brother to meet him and confront Tanner over the money.

Johnson was shown the video recording, along with still photos, and identified Glenn as being one of the men shown. She acknowledged, both before and during trial, that she could not see his face well, but "could just tell" the man in the video was Glenn. She, like Kitchens, denied being present when the shooting occurred.

DeKalb County police arrested Glenn at his sister's apartment. He had resided there for two or three weeks. In addition to the arrest warrant issued for Glenn, Detective Keith McQuilkin obtained a search warrant for the

5

apartment. The warrant is discussed more fully below in relation to one of Glenn's enumerations of error. Although the warrant did not include a cell phone as one of the items to be seized, Detective McQuilkin seized an LG MS395 cell phone from the floor of the apartment. At police headquarters, he removed the cell phone's battery and confirmed that the serial number matched the serial number on the empty box that was found in the back seat of Tanner's car.

Prior to trial, Calvin and Glenn filed a motion in limine seeking to block lay witnesses from identifying them as the two men shown on the motel surveillance video or still photographs taken from that video. The trial court denied the motion, and Pryor, Johnson, and Kitchens were all questioned about Glenn's appearance in the video. Glenn also moved to suppress the search of his sister's apartment and the resulting seizure of the LG MS395 cell phone. After a hearing, the trial court denied Glenn's motion to suppress.

Once trial began, the defense maintained that the video did not show Calvin or Glenn. Over Glenn's objection, the jury heard from Pryor, Kitchens, and Johnson that Glenn was the person in the video.[3] Johnson also

---

[3] For his part, Kitchens refused to identify Glenn as one of the people in the video. The State countered with an impeachment witness who averred that

told the jury she received a phone call from Glenn on the night of Tanner's murder. She stated that Glenn told her he "f**ked up," but did not elaborate. Glenn's sister, Tierra Curtis, testified to her belief that Johnson had planted the cell phone to help the police. Neither Calvin nor Glenn testified. The jury, as stated, found Glenn guilty on all counts.

Although Glenn has not challenged the sufficiency of the evidence in this case, we have reviewed the record and find that the evidence is sufficient to enable a rational trier of fact to find, beyond a reasonable doubt, that Glenn was guilty of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

II.

Glenn first contends that the trial court erred in denying his motion in limine to exclude testimony by lay witnesses identifying him as one of the perpetrators in the video surveillance and photographs. Glenn contends that Georgia law prohibits lay witness identification based on photos or video.

Georgia's new Evidence Code permits lay witness testimony in the form of opinions or inferences that are rationally based on the witness's perception, helpful to a clear understanding of the determination of a fact in

Kitchens had previously identified all of the people, including Glenn, in the video.

7

issue, and not based on scientific, technical, or other specialized knowledge. OCGA § 24-7-701 (a). That rule is modeled on Federal Rule of Evidence 701 (a), and when we consider the meaning of such provisions, "we look to decisions of the federal appellate courts construing and applying the Federal Rules, especially the decisions of the United States Supreme Court and the Eleventh Circuit." *Olds v. State*, 299 Ga. 65, 69 (2) (786 SE2d 633) (2016).[4]

In *United States v. Pierce*, 136 F3d 770, 774 (11th Cir. 1998), the Eleventh Circuit held that where there is "some basis for concluding that [a] witness is more likely to correctly identify" a defendant as "the individual depicted in surveillance photographs," then "lay opinion testimony identifying a defendant in surveillance photographs is admissible under Rule 701." In so holding, the *Pierce* court rejected the defendant's argument that lay witnesses were no better equipped than juries to compare the defendant's appearance with the individual depicted in surveillance images. Id. at 773.

---

[4] Glenn's argument that Georgia case law on this matter prior to enactment of the new Evidence Code constitutes a common law rule that must still be applied is unavailing. By using language nearly identical to Federal Rule of Evidence 701 (a), which case law shows addressed the matter at issue, the enactment of OCGA § 24-7-701 (a) was a statutory modification to the admissibility of such evidence and displaced prior precedent on the matter. After all, to the extent that the General Assembly adopted the federal rules, it did so with an "understanding of how those rules are applied in federal courts." Paul S. Milich, Georgia Rules of Evidence §1:3 at p. 26 (2016-2017 ed.).

The *Pierce* court acknowledged that a number of factors may determine if a witness is better suited to identify the defendant in such instances, and that perhaps the "most critical [factor] to this determination is the witness's level of familiarity with the defendant's appearance." Id.

Under the circumstances of this case, we find no meaningful distinction between lay witness testimony identifying the defendant in either photographs or in video recordings. See, e.g., *United States v. Gholikhan*, 370 Fed. Appx. 987, 991 (II) (11th Cir. 2010) (relying on *Pierce* to find no error in admitting lay witness testimony under Rule 701 identifying defendant's voice on monitored telephone calls); see also *United States v. Contreras*, 536 F3d 1167, 1170 (II) (A) (10th Cir. 2008) (finding no error in admitting, under Rule 701, witness's identification of defendant from security footage because witness's familiarity with defendant better equipped witness to identify defendant from that footage than jury). Indeed, in most cases, the opportunity to observe a person's mannerisms, gait, and similar characteristics depicted in video footage will increase the likelihood that a lay witness familiar with a defendant will be better equipped than jurors to identify the defendant from such images.

In this case, the video recording was of such poor quality that the average juror would not be able to distinguish the faces by themselves. The witnesses, who had known Glenn prior to the crime, were in a better position to correctly identify Glenn in the video than the jurors. Further, the ex-girlfriend's identification testimony was required to identify Glenn in the video because his appearance had changed since the time of the crime. Thus, we conclude that the trial court did not abuse its discretion in permitting lay witnesses to give testimony identifying Glenn as one of the people in the motel surveillance video.

## III.

Glenn's second contention is that the trial court committed reversible error by denying his motion to suppress evidence seized during the search of his sister's apartment. The State must prove that the challenged search was supported by a factually sufficient warrant. Here, Glenn contends that the State failed to satisfy its burden in two separate ways: (a) because the underlying affidavit does not demonstrate probable cause that Glenn murdered Tanner, and (b) because the State failed to establish the required nexus between the items particularized in the search warrant and the place to be searched. We disagree.

The duty of an appellate court reviewing a search warrant is to determine, based on the totality of the circumstances, whether the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant. *State v. Palmer*, 285 Ga. 75, 78 (673 SE2d 237) (2009). A magistrate's task in determining if probable cause exists to issue a search warrant is to make a "practical, common-sense decision" whether, given all the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Sullivan v. State*, 284 Ga. 358, 360 (2) (667 SE2d 32) (2008) (citation and punctuation omitted). "A magistrate's decision to issue a search warrant based on a finding of probable cause is 'entitled to substantial deference by a reviewing court.'" Id. (quoting *McClain v. State*, 267 Ga. 378, 388 (477 SE2d 814) (1996)). "Even doubtful cases should be resolved in favor of upholding a magistrate's determination that a warrant is proper." Id.

Glenn's first attack on the warrant, that it did not show probable cause that he was the murderer, does not succeed. "The test of probable cause requires merely a probability — less than a certainty but more than a mere suspicion or possibility." *Brown v. State,* 269 Ga. 830, 831 (2) (504 SE2d 443) (1998) (citations and punctuation omitted). A warrant to search a

murder suspect's home thus need not prove that the suspect was in fact the killer. See *State v. Stephens,* 252 Ga. 181, 184 (311 SE2d 823) (1984) ("By no means is probable cause to be equated with proof even by so much as a preponderance of evidence."). It must only show that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Glenn v. State*, 288 Ga. 462, 465 (704 SE2d 794) (2010) (citation and punctuation omitted).

The "fair probability" standard is easily reached here. As recounted in the affidavit supporting the search warrant, Glenn had been identified through still photographs taken from the surveillance video of the robbery and shooting. In addition, Glenn had been identified as the actual shooter by another person involved in the crime, and a warrant for Glenn's arrest had been issued. Based on the totality of the circumstances, the magistrate judge was authorized to conclude that probable cause existed for the issuance of the search warrant.

Glenn's second argument, that there was an insufficient nexus between the items to be seized and the location of the search, fares no better than his first. Glenn agrees that several witnesses had identified him as the shooter before officers applied for a search warrant, and numerous items relating to

the killing had not yet been recovered, including both the gun used to kill Tanner and Tanner's personal effects. Moreover, Glenn does not dispute that he had been residing in his sister's apartment that was targeted by the warrant or that the warrant so stated. Under these circumstances, the fact that Glenn, a suspect who had been arrested for the crime under investigation, lived at the address listed in the search warrant meant that there was at least a "fair probability" that items related to the crime would be found there. See *Murphy v. State*, 238 Ga. 725, 727-28 (234 SE2d 911) (1997). Moreover, the search warrant particularized items that were related to the commission of the crime. We conclude that there was a fair probability that the items listed in the search warrant would be found at the place that was searched.[5]

## IV.

Glenn next contends, citing *Arizona v. Hicks*, 480 U. S. 321 (107 SCt 1149, 94 LE2d 347) (1987), that the removal of the LG cell phone's battery to discover the serial number on the phone constituted an independent search that required a warrant. He is incorrect. Because the cell phone was found in

---

[5] We reject Glenn's contention that the affidavit lacked probable cause because there were two men involved in Tanner's murder and Glenn's "sole participation" was firing the weapon that killed the victim and not stealing items from the victim. The search warrant specifically sought firearms and ammunition related to the murder.

plain view during a lawful search, and the incriminating nature of the phone was "immediately apparent," the officer had authority to seize the phone and remove its battery to determine the serial number. *State v. Tye*, 276 Ga. 559, 562-563 (3) (580 SE2d 528) (2003).

Consistent with the Fourth Amendment, an officer may seize evidence of a crime that is in plain view without a warrant and even if discovery of the evidence was not inadvertent. *Horton v. California*, 496 U. S. 128, 130 (110 SCt 2301, 110 LE2d 112) (1990); see also *State v. Tye*, 276 Ga. at 563 (3) (holding that there is no requirement that an officer know with certainty that an item seized is evidence of a crime at the time of the seizure, only that there be probable cause to believe that this is the case). And *Hicks* itself described the question in that case as "whether the 'plain view' doctrine may be invoked when the police have less than probable cause to believe the item in question is evidence of a crime or is contraband." *Hicks*, 480 U. S. at 323.

Here, officers were lawfully executing both a search warrant and arrest warrant. The LG phone at issue was clearly visible on the floor near the door. The officer who seized the phone knew that a phone of the same model was missing from the victim's car, and thus had probable cause to believe that the cell phone he saw had been stolen from the victim and was evidence

14

of a crime. The existence of probable cause to believe that the phone was stolen, combined with the fact that the phone was in plain view, rendered the seizure reasonable even though the phone was not particularized in the search warrant. See *State v. Hill*, 338 Ga. App. 57, 60-61 (789 SE2d 317) (2016) (finding that an officer "can remove the battery from the phone to acquire an identifying subscriber number, analogous to a serial number, without implicating the Fourth Amendment, because the subscriber has no 'reasonable expectation of privacy in the serial number of his cell(ular) phone or other identifying information'") (citation omitted)). No additional warrant was required before officers removed the battery to ascertain the serial number. See *United States v. Green*, 2011 WL 86681, at *3 (D. Mass. Jan. 11, 2011), aff'd, 698 F3d 48 (1st Cir. 2012) ("There is nothing wrong with an agent's examining an item lawfully seized to determine its particular identifying number."). In *Hicks*, on the other hand, the state at some point conceded that the officer had no reason to suspect that the stereo equipment he found would be evidence of a crime until he manipulated it to reveal the serial number. *Hicks*, 480 U. S. at 331 (Powell, J., dissenting). This Court, moreover, has already explained that the search in *Hicks* would have been

reasonable if the officer had probable cause to believe the stereo equipment had been stolen. See *Moss v. State*, 275 Ga. 96, 105 (561 SE2d 382) (2002).

## V.

Finally, Glenn contends that his trial counsel rendered ineffective assistance by failing to redact statements, which the jury heard, directly communicating Kitchens's belief that Glenn was affiliated with the Bloods gang. Specifically, in his interview, Kitchens stated that Uzi was Glenn's "gang name" and that on the night of the crime Glenn told his brother "let me be that," which Kitchens took to mean "give me the gun" in Blood code. Glenn cannot succeed on this claim either.

As an initial matter, Glenn failed to raise his ineffective assistance of counsel claim in his motion for a new trial, which was amended with new counsel, which means that it is not preserved for review. "To preserve the issue of ineffective assistance of previous counsel, new counsel must raise the issue at the earliest practicable opportunity of post-conviction review or the issue is waived." *Ruiz v. State,* 286 Ga. 146, 148 (2) (b) (686 SE2d 253) (2009); see also *Prince v. State*, 295 Ga. 788, 793 (2) (b) (764 SE2d 362) (2014). Accordingly, he has not preserved this issue for review on direct appeal.

Judgment affirmed.  All the Justices concur.




Decided October 16, 2017.

Murder. DeKalb Superior Court. Before Judge Hunter.

Matthew K. Winchester, for appellant.

Sherry Boston, District Attorney, Lenny I. Krick, Harry S. Ruth, Anna G. Cross, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General, for appellee.