307 Ga. 587
FINAL COPY

S19A1582. GEBHARDT v. THE STATE.

MELTON, Chief Justice.

Following a June 18 to 26, 2018 jury trial, Franklin George Gebhardt was found guilty of malice murder and various other offenses in connection with the torture and stabbing death of Tim Coggins in October 1983.[1] On appeal, Gebhardt contends that the

---

[1] On March 19, 2018, Gebhardt was jointly indicted with William Franklin Moore for malice murder, felony murder predicated on aggravated assault, aggravated battery, aggravated assault, and concealing the death of another. Moore's trial was severed from Gebhardt's, and Moore entered a negotiated guilty plea. Following the June 18 to 26 jury trial, Gebhardt was found guilty on all counts. Gebhardt was sentenced to life for malice murder, 20 consecutive years for aggravated battery, and ten consecutive years for concealing the death of another. The trial court merged the aggravated assault count into the malice murder count for sentencing purposes and purported to merge the felony murder count into the malice murder count, but that count was actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 372 (4) (434 SE2d 479) (1993). Gebhardt timely filed a motion for new trial on July 3, 2018, which he amended on December 21, 2018. Following a hearing, on May 15, 2019, the trial court granted the motion for new trial in part, finding that the aggravated assault, aggravated battery, and concealing the death of another counts had to be vacated on the basis that there was insufficient evidence to show that the statute of limitation was tolled with regard to those crimes after they had been committed in 1983. See OCGA § 17-3-1 (c) ("Except as otherwise provided in Code Section 17-3-2.1[, which refers to felonies not at issue in this case,] prosecution for felonies other than [murder or other crimes punishable by death or life imprisonment] shall be commenced

evidence presented at trial was insufficient to support his murder conviction; that the trial court erred in denying Gebhardt's pre-trial plea in bar with respect to the charges of aggravated assault, aggravated battery, and concealing the death of another; that the trial court inappropriately commented on the evidence at trial; and that the trial court committed several evidentiary errors. For the reasons that follow, we affirm.

1. Viewed in the light most favorable to the jury's verdict, the evidence presented at trial reveals that, on the evening of October 7, 1983, Coggins, an African-American man, visited a club in Spalding County with predominantly African-American clientele. On the way to the club, Coggins told a friend who drove him to the club about a

within four years after the commission of the crime, provided that prosecution for felonies committed against victims who are at the time of the commission of the offense under the age of 18 years shall be commenced within seven years after the commission of the crime."). See also OCGA § 17-3-2 (identifying circumstances for tolling the statute of limitation with respect to the time period within which a crime must be prosecuted). The trial court denied the motion for new trial with respect to the felony murder and malice murder counts, but also vacated the felony murder count. See *Malcolm*, supra, 263 Ga. at 371 (4). Gebhardt is now serving a life sentence for malice murder. Gebhardt filed a timely notice of appeal on May 24, 2019, and his appeal was docketed to the August 2019 term of this Court and submitted for a decision on the briefs.

2

Caucasian woman, Ruth Guy, whom Coggins was dating at the time. When Coggins arrived at the club, three white males — Gebhardt, Moore, and another man — were waiting outside. Guy was Gebhardt's ex-girlfriend, and Gebhardt did not approve of Coggins's interracial relationship with her. Coggins knew Gebhardt and Moore, and he approached the men before entering the club, but no confrontation occurred between Gebhardt and Coggins at that time. After Coggins danced at the club for a while, Gebhardt came in looking for Coggins, and, eventually, Coggins left the club with Gebhardt and the other men with whom Gebhardt had been standing outside. Coggins called his friend, Samuel Freeman, and told Freeman that he was with "Frankie," whom Freeman knew to be Gebhardt. Coggins, Gebhardt, Moore, and the other man with whom Gebhardt and Moore had been standing traveled to a nearby party before heading to a mobile home park in Sunnyside, close to where Gebhardt lived.

In the early morning hours of October 8, Gebhardt began arguing with Coggins in the mobile home park, with Moore and Guy

3

present as well. Moore and Guy then got into the front of a car, and Gebhardt and Coggins got into the back seat, and the group started driving in the direction of Minter Road. When Gebhardt and Moore arrived in an area near Minter Road with Coggins, but apparently no longer with Guy, Gebhardt and Moore stabbed Coggins multiple times in the back, torso, wrist, and neck; chained Coggins to the back of their truck and dragged him behind it; and then stabbed Coggins some more. Coggins died from his stab wounds, and Moore and Gebhardt left Coggins's body in a field in a rural area that was intersected by a power line and that was about a mile away from the mobile home park.

Coggins's body was found the next day by Christopher Vaughn, who was out hunting squirrels with his father at the time. Coggins was still wearing his underwear and jeans, but he was without his shirt, socks, and shoes. Police were called to the scene, and they found Coggins's blood-stained beige sweater there. Drag marks around a dirt trail in a pattern that ended at Coggins's body were consistent with a person having been dragged behind a truck, and

4

abrasions on Coggins's body indicated that he had been dragged. However, police did not find any item that could have been used to drag Coggins behind a truck at that time.

Despite the preliminary investigation by police into the murder, the case went cold after about four or five months.[2] Over the subsequent years, Gebhardt bragged about having murdered Coggins for being involved with Guy, and he provided details about the murder that had not been made known to the public. Two weeks after the murder, Gebhardt admitted to a friend named Willard Sanders that Gebhardt and Moore had killed Coggins and dragged him along the power line after tying a logging chain around Coggins's feet. And, a few months after the murder, Gebhardt admitted to Vaughn at a party that he and Moore had killed the man that Vaughn had found "over there on the power line." Gebhardt also

---

[2] Clint Phillips, the lead investigator with the Spalding County Sheriff's Office on Coggins's murder case in 1983, later testified at Gebhardt's trial that Coggins's case was not always a top priority at the Sheriff's Office, and that Phillips was often pulled off the case to work on less serious crimes in other areas of the county.

told Vaughn on at least three or four other occasions that he and Moore had stabbed "the ni**er," referring to Coggins, 18 to 30 times, dragged him down the power lines, and then stabbed him again because Coggins was romantically involved with Guy. In addition, Gebhardt told Vaughn that he had thrown the murder weapon and Coggins's clothes into a well. Vaughn also overheard Gebhardt threaten a handyman on a different occasion, by saying "I'll kill you like I did that ni**er."[3] In 1985, Gebhardt threatened a man named Charlie Sturgill by saying, "the same thing that happened to that ni**er is going to happen to you and your momma," and stated to Sturgill on another occasion that Gebhardt had "stabbed that ni**er 25 times and cut him open." Gebhardt also said to an acquaintance named Jonathan Bennett that Gebhardt and Moore had stabbed Coggins 38 times and dragged him down the road after Gebhardt tied Coggins to the back of a truck. In 2016, Gebhardt reminisced

---

[3] Vaughn testified at trial that he spoke with an investigator at the Sheriff's Office about the murder in 2004 or 2005, and that he also sent a letter to the GBI about the murder in 2006 or 2007. Despite his efforts, however, the case was not reopened until 2016.

with Robert Smith about the times "back in the days" when a black man "never live[d] to tell about [a] white girl he was with," and, on another occasion, admitted to Smith that he had dragged and "gutted" Coggins "for messing with a white girl."

In April 2017, Gebhardt was incarcerated on unrelated charges, and Vaughn, who was also incarcerated at that time, went into Gebhardt's cell while wearing a recording device provided by police. Gebhardt had not yet been indicted or arrested for Coggins's murder. When Vaughn asked Gebhardt about Coggins's murder, Gebhardt initially denied knowing anything about it, but then he admitted that he did not know what he might have said about the murder while he was drunk at a party hosted by Willard Sanders (another man to whom Gebhardt had earlier admitted that he and Moore had committed the murder). Gebhardt was arrested for Coggins's murder in October 2017, and, while he was incarcerated with Patrick Douglas, Gebhardt told Douglas that he was a member of the Ku Klux Klan; that it was unfair that the sheriff could "get away with killing a ni**er," but he could not; and that he "didn't

7

need no help killing that ni**er," as he was the one who "slammed him down and stabbed him in the back." Also, while incarcerated with Terry Reed, Gebhardt learned that police had seized over 50 knives from Gebhardt's home, and Gebhardt told Reed that law enforcement would not find DNA evidence on those knives because he threw the knife used in Coggins's murder into a well under a shed at his house.

GBI Special Agent Jared Coleman took over the cold case in June 2016. After reviewing the case file and realizing that several items pertinent to the crime were never recovered during the initial investigation — including Coggins's footwear and t-shirt from the night of the murder, the item used to drag Coggins, and the murder weapon — Agent Coleman obtained two search warrants for Gebhardt's residence and property. The first warrant was for Gebhardt's home,[4] and police recovered 63 knives in connection with that search. The second search warrant was also for Gebhardt's home, but specified that, in addition to the home, the search was

_____

[4] Gebhardt does not challenge the validity of this search warrant.

8

"[t]o include [its] curtilage, all vehicles, and all persons currently contained on said property." During the second search, police used hydrovac technology[5] to excavate a sealed well on Gebhardt's property, and from the well they recovered a white shoe that was the correct size for Coggins's foot, two socks, a logging chain, a white t-shirt, broken pieces of a knife, and a knife handle.

Gebhardt challenges the sufficiency of the evidence to support his conviction for malice murder, but the evidence presented at trial was sufficient to enable a rational trier of fact to find Gebhardt guilty of that crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Gebhardt contends that the trial court erred in denying his pre-trial plea in bar to prevent his prosecution for aggravated assault, aggravated battery, and concealing the death of another. He claims that, because Coggins's murder took place 34 years before

[5] Greg Duvin, the general manager of Atlanta Hydrovac, testified that hydrovac technology involves the use of highly pressurized water to dig through and loosen soil, and then using a vacuum system to remove the slurry as one continues to dig deeper.

9

Gebhardt was indicted, and because the four-year statute of limitation with respect to these particular offenses had already expired, Gebhardt could not be tried for those offenses. See OCGA §§ 17-3-1 (c) and 17-3-2. However, Gebhardt cannot show harm from the fact that he was tried for these offenses, as he does not currently stand convicted of any of them. See *Hendricks v. State*, 283 Ga. 470, 473 (3) (660 SE2d 365) (2008) (an appellant "must show harm, as well as error, to demonstrate his entitlement to a new trial"). Gebhardt's only remaining conviction is for malice murder, because the trial court granted his motion for new trial on the aggravated assault, aggravated battery, and concealing the death of another counts, finding that those counts had to be vacated because the statute of limitation was not tolled with regard to those crimes. See *Anderson v. State*, 299 Ga. 193, 196 (1) n.4 (787 SE2d 202) (2016) (a defendant is not "convicted" on counts that are vacated or that merge with other offenses for sentencing purposes, and challenges to the sufficiency of evidence to support those non-existent convictions are moot). See also OCGA § 16-1-3 (4) ("'Conviction'

10

includes a final judgment of conviction entered upon a verdict or finding of guilty of a crime upon a plea of guilty."). Because Gebhardt was not convicted of the offenses that he now wishes to challenge, his challenges to those charges are moot. See *Anderson*, supra, 299 Ga. at 196 (1) n.4. To the extent that Gebhardt is attempting to argue that the jury was prejudiced in favor of finding him guilty of murder due to the existence of these other charges at his trial, we also find no merit to this argument, as the very same evidence that supported these charges (i.e., the stabbing and dragging of Coggins and leaving his body in a field) would have been relevant and admissible to give context to the murder for the jury even if these other charges had not been a part of his trial.

3. Gebhardt argues that the trial court plainly erred by improperly commenting on the evidence presented at trial. See OCGA § 17-8-57 (a) (1) ("It is error for any judge, during any phase of any criminal case, to express or intimate to the jury the judge's opinion as to whether a fact at issue has or has not been proved or as to the guilt of the accused") and (b) (Except with regard to

11

opinions about guilt, the "failure to make a timely objection to an alleged violation of paragraph (1) of subsection (a) of this Code section shall preclude appellate review, unless such violation constitutes plain error which affects substantive rights of the parties. Plain error may be considered on appeal even when a timely objection informing the court of the specific objection was not made, so long as such error affects substantive rights of the parties.").[6] Specifically, Gebhardt asserts that the trial judge commented on the evidence by stating (a) "asked and answered" on two occasions during defense counsel's cross-examination of two witnesses, and (b) "yes, there has," in response to an objection by defense counsel in which counsel claimed that no evidence had been presented during the testimony of Douglas that Gebhardt was a member of the Aryan Brotherhood. We identify no plain error.

In order to satisfy the test for plain error,

[f]irst, there must be an error or defect — some sort of deviation from a legal rule — that has not been

---

[6] Because the record reveals that Gebhardt did not object to the comments that he now wishes to challenge on appeal, our review is limited to a review for plain error.

12

intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

(Citation, punctuation and emphasis omitted.) *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011).

(a) The record reveals that, on the two occasions that the trial judge stated "asked and answered," the judge was specifically trying to get defense counsel to move on from repetitive lines of questioning, not that the judge was in any way commenting on what had or had not been proven in the case. The trial judge even told defense counsel to "move on" before stating "asked and answered" in connection with counsel's repetitive questioning of the first witness. When counsel engaged in another round of repetitive questioning three witnesses later, the trial judge once again stated "asked and

13

answered" in an effort to get defense counsel to move on from repeatedly asking variations of the same question that the witness had already answered. We see no error, let alone any clear or obvious one, in the trial court exercising its authority to keep the case moving along in the face of repetitive questions by defense counsel. See OCGA § 24-6-611 (a) (2) ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to . . . [a]void needless consumption of time[.]"). See also *Rickman v. State*, 304 Ga. 61, 64 (2) (816 SE2d 4) (2018).

(b) The record shows that Douglas, a member of the Aryan Brotherhood, testified that Gebhardt told him that Gebhardt was a member of the Ku Klux Klan. Douglas then testified that the Ku Klux Klan was part of the Aryan Brotherhood. When the State then posed a follow-up question to determine if it was difficult for Douglas to be "testifying against someone [who] is in the Aryan Brotherhood," defense counsel objected, stating that "[t]here ha[d] been no testimony whatsoever that Mr. Gebhardt is in the Aryan

14

Brotherhood." In overruling the objection, the trial judge stated, "yes, there has." Viewed in its proper context, this was not a comment on the evidence. The judge merely corrected defense counsel's erroneous assertion. See, e.g., *Smith v. State*, 317 Ga. App. 801, 805 (2) (732 SE2d 840) (2012) ("[A] trial judge may state his recollection as to some portion of the testimony without [violating OCGA § 17-8-57].") (citation and punctuation omitted). We see no plain error in the trial court's response to defense counsel's objection.

4. Gebhardt asserts that the trial court erred by allowing Samuel Freeman to testify, over defense counsel's hearsay objection, about a phone call in which Coggins allegedly told him that Coggins was with "Frankie" on the night of the murder.[7] However, even if the trial court abused its discretion in admitting this testimony, the admission of the evidence was harmless, as it was largely

_____

[7] Gebhardt also complains that the statement by this witness had not been provided to defense counsel prior to trial, but he does not develop in his brief any argument relating to how this failure to provide the statement prior to trial prejudiced him. He instead focuses in his brief on the argument that the statement constituted inadmissible hearsay. See Supreme Court Rule 22.

cumulative of the testimony of eyewitnesses who placed Gebhardt with Coggins on the night of the murder. See *Rutledge v. State*, 298 Ga. 37, 40 (2) (779 SE2d 275) (2015) (no harm from admission of hearsay that was "largely cumulative" of other properly admitted testimony).

5. In two enumerations, Gebhardt argues that the trial court erred by admitting into evidence the statements that he made to Vaughn and Douglas while he was incarcerated with them, because the statements were obtained in violation of Gebhardt's right to counsel. He contends that, because Vaughn and Douglas were acting as government agents at the time that Gebhardt spoke to them, the trial court should have granted his motion to suppress (a) the recording that Vaughn made of his conversation with Gebhardt while Vaughn was wearing a recording device, and (b) the statements that Gebhardt made to Douglas while Gebhardt was incarcerated with him. See *Massiah v. United States*, 377 U. S. 201 (84 SCt 1199, 12 LE2d 246) (1964). We disagree.

Under *Massiah*, the Sixth Amendment right to counsel is

> violated by the admission of incriminating statements that a government agent deliberately elicits in the absence of counsel *after judicial proceedings have been initiated against the defendant. Higuera-Hernandez v. State*, 289 Ga. 553, 554 (2) (714 SE2d 236) (2011); *O'Kelley v. State*, 278 Ga. 564, 565-567 (2) (604 SE2d 509) (2004), disapproved on other grounds by *Stinski v. State*, 286 Ga. 839, 856 (61) n. 5 (691 SE2d 854) (2010).

(Emphasis supplied.) *Kemp v. State*, 303 Ga. 385, 390-391 (2) (a) (810 SE2d 515) (2018). Furthermore, in order to be considered to be a government agent, the informant must (1) "have some sort of agreement with, or act under instructions from, a government official," and (2) take action to "deliberately elicit[ ]" incriminating information. (Citation and punctuation omitted.) *Higuera-Hernandez*, supra, 289 Ga. at 555-556 (2).

(a) *Vaughn Recording.* It is undisputed that, at the time that Gebhardt made his statements to Vaughn, Gebhardt had not yet been indicted for Coggins's murder. At that time, Gebhardt was in jail for an entirely unrelated offense. Accordingly, evidence supports the conclusion that there could not have been a violation of Gebhardt's right to counsel when he began speaking with Vaughn

17

about Coggins's murder, since "[u]nder [*Massiah*], the right to counsel is violated by the admission of incriminating statements which a government agent deliberately elicits *after indictment* and in the absence of counsel." (Emphasis supplied.) *Higuera-Hernandez*, supra, 289 Ga. at 554 (2).[8]

(b) *Statements Made to Douglas.* With respect to Douglas, evidence supports the conclusion that Douglas does not satisfy either prong of the test to determine whether he was an agent of the government for purposes of his jailhouse conversation with Gebhardt. Specifically, Douglas did not act under instructions from the police at the time that he spoke with Gebhardt. See *Higuera-Hernandez*, supra, 289 Ga. at 555-556 (2). Nor did he have any

---

[8] To the extent that Gebhardt argues that his recorded statement should have been excluded because he spoke to Vaughn without first being read his *Miranda* rights, such argument is without merit, as a conversation between inmates does not implicate the Fifth Amendment concerns underlying *Miranda*. *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966). See *Illinois v. Perkins*, 496 U. S. 292, 296 (II) (110 SCt 2394, 110 LE2d 243) (1990) (even where an inmate speaks to an undercover officer while in jail, "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*[, because] . . . [t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone that he believes to be a fellow inmate").

agreement with police to exchange any incriminating information that he received from Gebhardt "for payment, lenient treatment, or some other benefit." *Rai v. State*, 297 Ga. 472, 478-479 (3) (775 SE2d 129) (2015). Douglas verified as much during his trial testimony. In addition, the record reveals that Douglas did *not* take any action "designed deliberately to elicit incriminating information" from Gebhardt. Id. at 479 (3). To the contrary, Gebhardt opened up to, and spoke with, Douglas before Douglas had any conversation with the police about Gebhardt's jailhouse admissions. Douglas went to police only *after* Gebhardt told him about Coggins's murder, and he had never been recruited by police in any way to attempt to elicit incriminating statements from Gebhardt. Because evidence supports the conclusion that Douglas does not meet either prong of the test to show that he was acting as a government agent at the time that Gebhardt spoke with him, we identify no abuse of discretion in the trial court's decision to allow Douglas to testify regarding Gebhardt's statements to him.[9]

---

[9] Gebhardt's argument that his statements to Douglas should have been

19

6. Gebhardt argues that the trial court erred in denying his motion to suppress evidence of the items recovered from the sealed well on his property pursuant to the second search warrant obtained by police. He asserts that (a) the search of the well was not supported by probable cause, and (b) the warrant issued to authorize the search was not specific enough to be valid.

"[T]he Fourth Amendment provides that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'" (Emphasis omitted.) *United States v. Travers*, 233 F3d 1327, 1329 (II) (11th Cir. 2000). When a magistrate makes a determination as to whether probable cause sufficient to issue a search warrant exists, the magistrate simply makes

> a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

excluded because he had not been given *Miranda* warnings is without merit. See *Perkins*, supra, 496 U. S. at 296 (II).

20

(Citation and punctuation omitted.) *DeYoung v. State*, 268 Ga. 780, 787 (7) (493 SE2d 157) (1997). "(A) search conducted pursuant to a search warrant, regular and proper on its face, is presumed to be valid and the burden is on the person who moves to suppress the items found to show that the search warrant was invalid." (Citation and punctuation omitted.) *Hourin v. State*, 301 Ga. 835, 844 (3) (b) (804 SE2d 388) (2017). When reviewing a search warrant, our duty on appeal

> "is to determine, based on the totality of the circumstances, whether the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant." *Glenn v. State*, 302 Ga. 276, 281 (III) (806 SE2d 564) (2017). "A magistrate's decision to issue a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court," *DeYoung*, 268 Ga. at 787, and "[e]ven doubtful cases should be resolved in favor of upholding a magistrate's determination that a warrant is proper." *Sullivan v. State*, 284 Ga. 358, 361 (2) (667 SE2d 32) (2008).

*Leili v. State*, 307 Ga. 339, 342 (2) (834 SE2d 847) (2019). With these principles in mind, we address each of Gebhardt's contentions in turn.

(a) *Probable Cause.* The record reveals that police sought the

second search warrant in connection with the crimes of malice murder, felony murder, aggravated assault, aggravated battery, and concealing the death of another based on information presented in an affidavit from Agent Coleman.

On October 9, 1983, the GBI was called in to assist the Spalding County Sheriff's Office in the investigation of the death of Coggins. Coggins had died from multiple stab wounds, and other wounds on Coggins's body and drag marks at the crime scene led investigators to conclude that Coggins had been dragged as well. Coggins had last been seen alive on October 8, 1983, in a mobile home park, where he got into a car with Gebhardt, Moore, and Guy, before heading off in the direction where his body was later found by Vaughn and others the next day.

In a May 26, 1991 interview with GBI agents, a man named Charles Carey, Jr., informed the agents that he had witnessed Gebhardt bragging about Coggins's murder, and that Gebhardt admitted that he had participated in dragging Coggins's body through the woods by tying a logging chain to his pants.

22

Investigators later conducted an interview with Vaughn, who had known Gebhardt and Moore since Vaughn was a child, and Vaughn informed authorities that Gebhardt had spoken freely with him about stabbing Coggins multiple times and dragging him with a logging chain behind a truck. Vaughn also noted that Gebhardt admitted that he had thrown the murder weapon into a well on his property at 1704 Patterson Road in Griffin, Georgia. Agent Coleman believed that the information provided by Vaughn was reliable, as it was consistent with evidence collected from the crime scene.

Investigators interviewed an ex-girlfriend of Gebhardt who had rekindled her relationship with Gebhardt in the early 2000s, and she indicated that, when Gebhardt was angry with her, he would warn her that she would end up "like that ni**er in the ditch," and that he would "drag [her] down the road that [he and someone else had] dragged that ni**er." The only homicide of which the girlfriend was aware involving an African-American being dragged down the road was the murder of Coggins.

Back in 1983, Gebhardt and Guy provided to investigators an

alibi for Gebhardt for the night of the murder, stating that Gebhardt had stayed with Guy all night on the night of the murder. In a May 2017 interview between Agent Coleman and Gebhardt, however, Gebhardt denied knowing Guy and further denied knowing Coggins, despite other witnesses attesting to the fact that Gebhardt had been seen associating with Coggins.

Pursuant to the first search warrant for Gebhardt's home issued on May 9, 2017, police located a sealed well on Gebhardt's property, as had been previously identified by Vaughn. At that time, the police could not excavate the well in a safe manner that would have preserved the structural integrity of the well, but other items of evidence were seized from Gebhardt's residence.

After Gebhardt and Moore were charged for murder in October 2017, the District Attorney's office conducted its own investigation, and interviewed Amy Smallwood, who informed authorities that the knife used to kill Coggins, and Coggins's clothing, had been disposed of in a well on Gebhardt's property.

Agent Coleman consulted with the GBI and private entities in

an effort to find a safe way to excavate the earth within the well area on Gebhardt's property to find possible evidence connected to Coggins's murder. Through this investigation, Agent Coleman discovered the digging process involving hydrovac technology.

Based on these facts, Agent Coleman then requested

> [t]he court[']s authorization to obtain [a search warrant to] search for the evidence which may be contained within the well[, because] . . . the alleged evidence contained within the well ha[d] been encased and entombed within the site for approximately 34 ½ years[,] . . . [and] [n]o prior known effort to excavate the site [had been done]. As such, it [ ] was reasonable to conclude that the evidence remain[ed] encased or enclosed within the area in which it was allegedly buried . . . particularly items of clothing of the victim . . . and the knife used to murder him.

We conclude that, under the totality of the circumstances, the issuing judge had a substantial basis for determining that probable cause existed for an additional search of Gebhardt's property pursuant to a second search warrant, as there was a "fair probability" of evidence relating to Coggins's murder being found in the well on the property. See, e.g., *Leili*, supra, 307 Ga. at __ (2).

(b) *Scope of the Warrant.* As to the scope of the warrant itself,

we conclude that the warrant was sufficiently particular to be valid.

Indeed,

> [a] warrant which authorizes the search of a particular dwelling extends by implication to areas within the curtilage of the dwelling. "Curtilage" has been defined as "the yards and grounds of a particular address, its gardens, barns, [and] buildings."

(Citation and punctuation omitted.) *Landers v. State*, 250 Ga. 808, 809 (301 SE2d 633) (1983).

To begin with, the warrant authorized the police to search for the following items: "[b]iological evidence including but not limited to: DNA such as blood, hair, and fibers . . . [k]nives . . . [c]hains which may have been used to drag a body . . . [p]hotographs/video, any other means to document the crime scene . . . [a]nd any other items of evidentiary value." Gebhardt does *not* challenge the search warrant with respect to the scope of the items that were authorized to be seized pursuant to the warrant. He attempts to challenge the warrant only with respect to the description of the place that was authorized to be searched pursuant to the warrant.

In this regard, the warrant here specifically refers to the place

26

to be searched as "1704 Patterson Road[,] Griffin, Spalding County, Georgia 30224," and states that the search was "[t]o include [its] curtilage." The well was contained on the land at the specified address, as the police had discovered the well there during their first search of Gebhardt's property — a search which Gebhardt does not challenge. And, as contemplated in the warrant, searching the well required a process of sifting through the ground on the property because the well itself had been sealed by concrete. Contrary to Gebhardt's contention, it was not necessary for the warrant to state the word "well" to further specify the place on the grounds of the residence that the police were authorized to search. See *Landers*, supra. The location of the search was already identified in a more than sufficient manner in the warrant.

7. In two enumerations of error, Gebhardt claims that the trial court erred in allowing two witnesses to testify, over defense counsel's objection, about the racial climate that existed in Griffin around the time of the murder. Specifically, he contends that Jesse Gates, a former employee of the Spalding County Sheriff's Office,

27

should not have been allowed to testify that he was aware of racial tensions in the community and Ku Klux Klan rallies taking place around the time of the murder; and that another employee of the Sheriff's Office, Oscar Jordan, should not have been allowed to testify that he knew about a cross-burning incident that took place around the time of the murder. Gebhardt asserts that this testimony was irrelevant, while the State contends that it was relevant to show Gebhardt's motive for killing Coggins.

However, even if the statements from the two witnesses were irrelevant and inadmissible, they constitute only two pages of a seven-volume trial transcript, and they are far overshadowed by the overwhelming evidence connecting Gebhardt to Coggins's murder and his personal reasons for committing it. In this regard, the evidence showed that (1) Gebhardt was the last person seen arguing with Coggins on the night of his murder before driving off with him toward the area where Coggins's body was later found; (2) Gebhardt repeatedly confessed to multiple witnesses over the 34 years following the murder that he had killed Coggins and that he did it

28

by stabbing and dragging him; (3) Gebhardt knew details about the stabbing and dragging death of Coggins that had not been discovered by police during their initial investigation, including the location of the murder weapon, logging chain, and clothes that had been discarded in a sealed well on Gebhardt's property; and (4) Gebhardt indicated to others on multiple occasions that his motive for killing Coggins was based on his hatred of African-Americans and Coggins's involvement in an interracial relationship with Gebhardt's ex-girlfriend. This evidence rendered harmless any error in the admission of the isolated statements from the two witnesses about Klan activities and the racial climate in Griffin in 1983. See, e.g., *Smith v. State*, 299 Ga. 424, 432 (2) (d) (788 SE2d 433) (2016).

*Judgment affirmed. All the Justices concur.*

DECIDED DECEMBER 23, 2019 --- RECONSIDERATION DENIED JANUARY 13, 2020.
Murder. Spalding Superior Court. Before Judge Sams.

*Virgil L. Brown & Associates, Jason S. Johnston*, for appellant.

*Benjamin D. Coker, District Attorney, Marc A. Mallon, B. Ashton Fallin, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Katherine D. Emerson, Assistant Attorney General*, for appellee.